## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## NORTHERN DIVISION

**Barbara Tripp, individually and on her own behalf and on behalf of all others similarly situated,**

               ***Plaintiff,***

    **v.**

**Perdue Foods LLC,**

               ***Defendant.***

**Civil Action No. 24-CV-987**

**JURY TRIAL DEMANDED**

## COLLECTIVE ACTION COMPLAINT

1. Plaintiff Barbara Tripp, individually and on behalf of herself and all others similarly situated, brings this action against Defendant Perdue Foods LLC ("Perdue") for damages and other appropriate relief related to Perdue's misclassification of Tripp and members of the proposed collective as "independent contractors."

2. Despite inducing chicken farmers (known in the industry as "growers") to contract to raise chickens with Perdue through promises of independence, Perdue treated Tripp and all of its growers as controlled employees under federal law. As an employee, Tripp was entitled to wages, benefits, and other payments that Perdue did not provide, even though Perdue knew that Tripp should have been classified as an employee based on the level of control Perdue exercised over Tripp's chicken growing operation. Likewise, Tripp was forced to bear expenses that she could not have been required to bear if she were properly classified as an employee. Perdue treats

its growers across the country in the same fashion, using the same restrictive contracts, guidelines, and supervision to dictate nearly every aspect of how they run their farms.

3.    Through this and other conduct described below, Perdue violated federal law regarding the wages that it was obligated to pay its growers as employees.

4.    Plaintiff brings this action individually and on behalf of herself and the collective as defined below against Defendant Perdue for failure to pay minimum wage and overtime as required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq.

## PARTIES

5.    Plaintiff Barbara Tripp is a resident of Aulander, North Carolina who worked under contract as a grower for Defendant Perdue Foods LLC in Aulander, North Carolina.

6.    Defendant Perdue Foods LLC is a limited liability company organized under the laws of Maryland, with its principal place of business in Salisbury, Maryland.  Perdue Foods LLC is a wholly owned subsidiary of Perdue Farms Inc., which also has its principal place of business in Salisbury, Maryland.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law.

8.    This Court has general personal jurisdiction over Perdue because it is organized under the laws of Maryland and has its principal place of business in Maryland.

9.    Venue is proper in this district under 28 U.S.C. § 1391 because Perdue resides in this district.  Venue is also proper in this district because Plaintiff and Defendant previously agreed that "the exclusive forum for any dispute between the Parties based in tort, statutory law, common

law, and/or under the Agreement shall be the federal and state courts having jurisdiction in Wicomico County, Maryland."

**FACTUAL ALLEGATIONS**

**I.  Factual Background**

10.    "Broilers" are chickens raised for meat consumption. Modern broilers are generally slaughtered when they are about six weeks old.

11.    After the 1950s, the U.S. broiler industry began to shift away from individual farmers raising chickens and selling them to live poultry dealers or poultry processors.  Between 1950 and 1960, the percentage of independent poultry farmers relative to contract farmers (farmers under exclusive contracts with a single chicken processing company) dropped from 95% to 5%. During this time, large companies known as "integrators" began to combine the various stages of production, a process known as vertical integration.

12.    Several decades ago, these contract growers actually were independent—they relied on their skills and knowledge to grow the most high-quality birds they could while managing their own input costs and growing conditions.  When they delivered a premium product to the poultry processor, they were rewarded with higher prices or bonuses.  In sum, growers were fairly compensated for the skill, expertise, and labor they provided, and they managed their farms in the manner they saw fit.  Today, growers working for Perdue have a very different relationship.

13.    Perdue is the third largest broiler chicken company in the country.  Perdue is highly vertically integrated, with its employees overseeing almost every aspect of the process.  As discussed further below, this includes, among other things, growing the chicken feed, hatching the chicks, veterinary care, transportation, slaughtering, marketing, and selling of the final product.

14.    While Perdue now directly owns almost all of its broiler supply chain, it has generally not purchased the farms where its chicks are raised to full weight.  Instead, Perdue

3

outsources the process of raising birds to broiler growers that Perdue calls "independent farmers," and it requires these farmers to pay for facilities and tools of the trade that Perdue dictates are necessary to grow broilers under a Perdue contract. But in truth, the growers are anything but independent—all of the expenses Perdue requires growers to undertake are for Perdue's primary benefit.

15.     Perdue's growers raise chickens that Perdue owns for about six weeks—from shortly after hatching until they are large enough to slaughter. Perdue recruits growers by promising them independence and financial success. In recruitment materials, Perdue promises "independence" and claims that, "[a]s a poultry farm owner, you'll never punch a time clock, and you'll have the satisfaction of leading your own business."

16.     But Perdue refuses to grant growers the independence they were promised or the compensation they are entitled to.

17.     In reality, Perdue controls virtually every aspect of growers' operations. There is no "independence" for growers under contract with Perdue, despite the growers shouldering most of the financial risk—including the large investment necessary to build barns (to Perdue's specifications and for its benefit), and the risk of loss if a flock is lost due to a power outage or disease. Indeed, this financial risk—and Perdue's unwillingness to compensate growers with the wages and benefits to which employees are entitled—is why Perdue falsely classifies its growers as "independent." In reality, however, Perdue's growers are employees entirely under the control of Perdue. Perdue knows the level of control it exercises over growers entitles them to treatment under the law as employees, but it does not treat them as such in order to boost its profits.

18.     Perdue requires growers to work exclusively for Perdue. After the contract is signed, Perdue uses onerous guidelines to take this exclusivity to extreme lengths: for example,

preventing growers and their "family members" from even *visiting* a farm associated with a different integrator.

19.    By misclassifying growers, Perdue offloads enormous capital costs and financial risks onto them.   Instead of being responsible for the cost of constructing chicken houses, upgrading equipment, managing waste, and potentially losing chickens to natural disasters or other unexpected circumstances, Perdue forces growers to bear these costs by deceptively classifying growers as independent contractors while meticulously controlling virtually every moment and every aspect of their work.

20.    Indeed, this offloading of the responsibility to incur financial liabilities and large, ongoing debt payments for Perdue's benefit is not only a primary financial reason Perdue misclassifies its growers as "independent contractors"—Perdue also uses the investments it repeatedly obligates its growers to make to trap growers into continuing to work for Perdue even after they discover that they were not given the independence they were promised.  Having taken on large loans to pay for facilities and upgrades—and then being required to take on even more debt for further upgrades and equipment—growers have no meaningful choice but to continue growing for Perdue as long as Perdue permits them to.

21.    Put differently, Perdue has devised a scheme to saddle growers with risk and debt, while at the same time directing and controlling every aspect of the chicken growing process and refusing to compensate growers in the manner that federal law requires.

22.    Growers are a key part of Perdue's business; without growers, Perdue's business would not be able to function since it does not raise its own chickens.

23.    To begin working as a grower, farmers must make large investments in barns and equipment, and then ultimately must make upgrades—all at Perdue's direction.  A farmer must

build "grow out" houses that will hold thousands of chickens. These houses are expensive to construct and maintain, often requiring growers to take out large loans to finance them. They also are built, maintained, and upgraded to Perdue's precise specifications and therefore would not be suitable for growing chickens for another integrator absent further economic investment.

24.     Perdue requires growers to build houses for the chickens to precise specifications dictated by Perdue. After the houses are built, Perdue forces growers to pay for costly, highly specific facility or equipment changes. Perdue threatens to sever grower contracts—which growers rely on to repay their significant loans—if a grower does not make the costly changes to Perdue's exact specifications. And whenever Perdue decides, those specifications change over time, requiring growers to make even more significant payments and often go further into debt.

25.     Perdue growers are not required to have experience as chicken growers when they enter into their first contract with Perdue. Perdue trains growers and monitors whether growers are following Perdue's guidelines. Perdue required Tripp to attend a training in person, watch Perdue-sanctioned videos, and read and apply written materials that Perdue issued governing a variety of day-to-day farm operations.

26.     Perdue uses a form contract with its growers ("Poultry Producer Agreement") nationwide. The contract is not negotiated between Perdue and each grower, as would be expected in a business-to-business relationship. Instead, every grower must sign the same contract and Perdue does not permit negotiations around the contract or modifications to its terms.

27.     The Poultry Producer Agreement attempts to assert that growers (referred to in the Agreement as "producers") are independent contractors, not employees. The Agreement states that it is "a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors."

28.     The Poultry Producer Agreement states that growers will perform work "using the skills, knowledge, and discretion" that each grower "possesses."  This is false, as becomes clear after a grower signs the Poultry Producer Agreement.

29.     The Poultry Producer Agreement requires that growers "comply with any bio-security policies, audits, measures or guidelines required by PERDUE."  But, notably, those Perdue "guidelines" and "biosecurity policies" are not provided until *after* a grower signs their contract with Perdue.  In this way, Perdue entices growers with marketing materials and contractual language that promises them independence while knowing that Perdue will subsequently control every material aspect of these growers' work.  Like all other growers, Tripp was required by her local supervisor to follow biosecurity policies on her farm which were conveyed as mandatory and changed from time to time at Perdue's discretion.

30.     The reason Perdue would like to classify growers as independent contractors and not employees is plain: money.  Employees, unlike independent contractors, are entitled to prompt payment of certain financial benefits, such as a minimum wage.  Employees are also entitled to compensation for costs and expenses their employers require them to undertake for the employer's primary benefit.

31.     While controlling the method, manner, and timing of growers' work, Perdue simultaneously forces growers to bear economic risks that are the result of Perdue's decisions.  Perdue controls all the inputs that contribute substantially to the size of the chickens (the type and quantity of feed, the breed and size of the chicks delivered and picked up, the temperature, medications, and the method and manner of raising chickens).  But if those inputs controlled by Perdue result in smaller chickens, Perdue reduces growers' pay.

32.     Growers are often unable to make enough money for basic living expenses under the compensation scheme that Perdue has designed, indicating that Perdue's growers are often paid less than the minimum wage for their time worked. Perdue growers have cited the risk of bankruptcy because compensation is so low.  And, according to a study by the National Contract Poultry Growers Association and the U.S. Department of Agriculture, 71 percent of growers whose sole source of income was chicken farming were living below the poverty line.

33.     Rather than properly pay its growers, Perdue wants to have its cake and eat it too: have growers that function as controlled employees but compensate them as if they are independent contractors and force them to bear financial burdens that employees should not have to bear for their employer's benefit.

34.     Tripp's experience is emblematic of Perdue growers.  Tripp's contract from North Carolina is materially identical to a contract that Perdue used in Georgia and South Carolina in 2016.[1]  On information and belief, Perdue has used and continues to use a uniform contract nationwide with all of its growers, with the possible exception of a handful of growers who raise organic birds or Cornish birds.

35.     Perdue assigns a direct supervisor to each grower who has authority to mandate changes to the methods of work, discipline, and manage the grower. Tripp's supervisor's title was "Flock Advisor."[2]

---

[1]  The sole difference is the addition to more recent contracts – including Tripp's – of a provision barring Tripp and other growers from taking pictures of chickens *on their own land.* This onerous requirement once again makes clear that Perdue controls the farm.

[2]  As discussed below, Perdue uses multiple titles for this position.  Whatever title Perdue creates, these individuals act at all times as the direct manager of the individual growers under their supervision wherever they are located.

36.     These supervisors visit farms with chickens at least weekly to ensure growers are complying with Perdue's requirements.  During these visits, the supervisor conducts an inspection and assigns tasks to the Perdue grower they manage.  Tripp's supervisors visited weekly and provided specific verbal and written requirements for changes she needed to make to the farm.

37.     In an attempt to obfuscate the level of control the Poultry Producer Agreement gives Perdue over growers, Perdue hides many of its requirements in other guidelines—guidelines that are not provided to growers until *after* they sign the Poultry Producer Agreement and that are modified often years later at Perdue's discretion.  Perdue requires that growers "adhere to the PERDUE Poultry Welfare and Bio-Security Programs."  It further contractually requires that growers "comply with any bio-security policies, audits, measures, or guidelines required by PERDUE."  Perdue's supervisors evaluate and grade growers' compliance with the company's bio-security guidelines that change at Perdue's discretion.

38.     The written guidelines issued to growers are finely detailed.  Compliance with the guidelines requires following Perdue's directions about every aspect of the growing operation. And the Poultry Production Agreement states that "[i]n the event the grower is not fulfilling his/her obligations then this agreement may be terminated."

## II.    Perdue's Control

39.     Perdue exercised its right to control every aspect of the time, method, and manner of Tripp's work, whose experience is typical of other Perdue growers.  Using broad language and terms that are not defined for the grower, Perdue lays the groundwork for its scheme in the Poultry Producer Agreement:

> PRODUCER AGREES: To accept the birds when consigned and to raise the birds until removed at PERDUE's direction from the PRODUCER's farm…To comply with any bio-security policies, audits, measures or guidelines required by PERDUE…To provide care for the health and

welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Program… PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities. If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock…. PERDUE shall be fully authorized, without prejudice to any and all other legal rights and remedies it may have, to enter upon the premises of the PRODUCER where the flock is located, either to feed and care for the flock on PRODUCER's premises or to take immediate possession and to remove or dispose of said flock in such manner as PERDUE may see fit.

40. After contract signing, Perdue then exercises control at a level that could never be anticipated by the contract, both through the use of "guidelines" that are not disclosed at the time of signing (and that can and did change for Tripp and other members of the Proposed Collective at Perdue's discretion) and through the use of managers, whose power over growers could not be anticipated by any reading of the Poultry Producer Agreement. Perdue's actual control over the methods, manner, and timing of growers' work is detailed below.

### a. Methods

41. Perdue controls the methods used to raise chickens. Despite promises of independence in the Poultry Producer Agreement and marketing materials, and despite the existence of other methods for raising chickens, Perdue controls growers' use of specific methods for raising chickens down to extreme levels of detail. It does this in two ways: through extensive Perdue guidelines that are provided after contract signing and through Perdue managers who are assigned to growers after contract signing.

42. On a day-to-day basis, Perdue exercises control over methods through each grower's manager. While the Perdue Poultry Producer Agreement misleadingly defines these supervisors as "Advisors," it becomes clear after contract signing that a grower has no choice but to accept their "advice." These supervisors oversee, discipline, train, and manage growers like

Tripp. As noted above, supervisors are referred to as "Flock Advisors," "Flock Supervisors," "Growout Managers," "Flock Managers," "Live Production Managers," or other similar terms. Perdue requires growers to produce records to their supervisor on demand.

43. According to recent job listings in at least four states, a Perdue Flock Advisor "Works directly with assigned contract producers to improve company profitability and competitive position by implementing production programs and documenting producer compliance at each visit to the farm." Another job listing explains: "The purpose of a Flock Advisor is to protect the Perdue Farms, Inc. brand name. Improve company profitability by serving as a representative *overseeing the people, poultry and daily operations* on his/her route" (emphasis added). The preceding job description matched Tripp's experience with the supervisor Perdue assigned to her, as well as that of other members of the Proposed Collective.

44. A recent job listing by Perdue in Georgia for a "Growout Manager" provides even more detail:

> [A Growout Manager] Provides leadership, training and coaching to associates, as well as producers to ensure all company policies and programs are being met… Drives program compliance and competitive farm performance. In farm management, meets all facility operational plans to ensure scheduling of placements, harvest, health checks and accurate weight projections for bird movements. Reports on progress to include physical farm improvements, performance metrics and safety. As a Housing Manager, works with new prospects and existing growers to add the square footage needed to meet the needs of the complex. Manages the average service cost of the complex to not exceed the current average by strategically locating new farms as close as possible to the plant locations. Facilitates the construction of square footage by evaluating new sites, introducing prospects t[o] lenders, working with builders and equipment companies to provide quotes to prospects, arranging grading bids and manages the scheduling of contractors to attain the most equate footage in the least amount of time. Develops new grading contractors, builders, equipment vendors and electricians to facilitate the additional expansion. Works with lenders, zoning, university staff and extension to help facilitate the expansion project.

45.     The preceding job description matched Tripp's experience with the supervisor Perdue assigned to her.

46.     Another recent job listing by Perdue for a "Housing Manager" in Indiana explains that in addition to working "directly with assigned contract producers to … implement[] production programs and document[] producer compliance at each visit to the farm," this position is heavily involved in overseeing growers' construction projects:

> [A Housing Manager] acts as general contractor for new construction and renovation of existing structures. Monitors the day to day work of the contracted construction crews. Coordinates with the producers, vendors and subcontractors. Works with perspective [sic] farmers laying out the construction of new poultry houses and the renovation of aging houses ensuring that the environment provided to the flocks meets the requirements of the operation. Purchases an[d] transports local materials and equipment to the job sites. Provides estimates of the remodeled construction cost of existing poultry facilities.

47.     In addition to the day-to-day management by its supervisors, the other primary way that Perdue controls the methods of growers' work is through written guidelines disclosed after a grower signs a contract.  The guidelines give Perdue wide-ranging, constant, and nearly unfettered control over virtually every aspect of its growers' work.  Compliance with these guidelines is mandated by the Poultry Producer Agreement even though growers are not provided with the guidelines prior to signing.  These guidelines can and do change at Perdue's sole discretion, giving the company the ability to modify how it controls growers without any contractual change.

48.     These guidelines are finely detailed and conveyed in written communications from Perdue, which are reiterated verbally by Perdue's "Advisors."  For example, Perdue issues temperature guidelines that provide the exact degree temperature at which the grow out houses should be kept.  This requirement varies throughout the day and requires specific humidity levels and ammonia levels.  Perdue further requires specific methods of operating fans and ventilation.

Perdue requires specific heights for water drinkers and specific hours for operation of lighting. Indeed, Perdue even requires grass *outside* of chicken houses to be cut on a schedule controlled by Perdue's delivery of chicks and Perdue's supervisors.

49. Perdue's guidelines require use of specific methods for euthanizing chickens, specific timelines for identifying and removing dead chickens, and specific methods for burying dead chickens, including the specific depth. As with other guidelines, these are requirements that Tripp was forced to follow, as were the other members of the Proposed Collective.

50. Perdue's contract also requires growers to comply with Perdue's "Poultry Welfare and Bio-Security Programs," which contain detailed requirements on housing and feeding chickens, including on issues not obviously related to animal welfare or bio-security. (Again, these guidelines are not provided to growers before signing the contract and were changed by Perdue during Tripp's time working for Perdue.) For example, growers are banned from visiting other farms, banned from allowing "unauthorized" visitors on their land (but must permit Perdue supervisors on their land), and required to post Perdue's signs on their farm.

51. Perdue requires growers to report "within 24 hours" to her supervisor "if any birds, for any reason, do not develop normally…" Each flock includes thousands of birds. Therefore, on information and belief, this extraordinarily broad requirement is often practically impossible to comply with and serves as both a method of controlling growers like Tripp and as a pretext for termination.

52. Even after Perdue picks up its chickens, it mandates that growers adhere to guidelines for cleaning, maintenance, and preparation for a future delivery of chickens.

53. Per the Poultry Producer Agreement, growers "can be immediately terminated by PERDUE" for failure of "proper house management or care." On information and belief,

determination of "proper house management or care" is entirely at Perdue's discretion and can be used to terminate growers for almost any reason, which is not disclosed to growers at contract signing.

54.     Despite the promises made in the Poultry Producer Agreement, growers are not permitted to use their own "skills, knowledge, and discretion" to implement methods that would improve the growth of the chickens.  For example, Tripp was required to follow specific lighting guidelines required by Perdue including level or light and timing of light or darkness regardless of whether she believed those light conditions were best for the chickens. And Perdue required specific rules about the time that water should be withdrawn from chickens before pickup and punished Tripp when Perdue believed she had used her own judgment on the timing of that withdrawal.

55.     Perdue's requirements about water withdrawal times and bird euthanasia are vigorously enforced.  Tripp's supervisors told her that compliance with the policies was mandatory.  For example, when Perdue supervisors determined that Tripp's water lines were withdrawn at a different time than they preferred, Tripp was disciplined and forced to watch a video on Perdue's requirements for water line placement.

### b.  Manner

56.     Perdue controls the manner of raising chickens, too.  Most obviously it does this by controlling all the inputs used to raise chickens, including the chicks themselves.  Perdue requires the use of specific feed, medication, vaccinations, and "other supplies"—all of which are provided by Perdue and which growers cannot substitute for inputs of their own choosing.  Perdue dictated that Tripp use only specific types of approved feed and medication, and Tripp "[could] be immediately terminated" by Perdue for using unapproved feed or medication, even though there

are other types of feed and medication that can be used effectively. On information and belief, the same requirements apply to all members of the Proposed Collective.

57. According to the Perdue Poultry Producer Agreement, "PERDUE will determine in its sole and absolute discretion: a. the breed of chickens PRODUCER will receive; b. the number and density of chickens in each flock delivered to PRODUCER's farm; c. the size, weight and age of the chicken to be produced; d. the time for processing each flock; and e. the date, time and estimated interval of placement for future flocks." As discussed further below, Perdue's sole and absolute control of the type, timing, and health of chickens is not only a clear manifestation of its control over Tripp and other growers but also has significant impact on these growers' compensation. Tripp, like other growers, had no ability to influence what hatchery her chicks came from or to refuse a delivery of chicks if the chicks looked to be in poor health. Perdue decides the number of chicks delivered in each flock. Perdue made unilateral decisions regarding changes in broiler density (the number of chickens in a barn) that affected Tripp's earnings.

58. Tripp, like all Perdue growers, had to use feed provided by Perdue. The Poultry Producer Agreement states that growers must "adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock." Again, growers learned how much control that provision gave Perdue only after signing their contracts. Growers have no control over the timing of feed deliveries, which can and often do happen in the middle of the night. Growers must be present at the time of the deliveries and have no right to refuse delivery of feed or to reschedule deliveries. Perdue also controls the type of feed growers receive, including its nutritional content and which type of feed should be used at different points of the growth cycle.

59. As is typical for Perdue growers, Perdue controlled the type of materials Tripp was allowed to use, down to the type of cleaning supplies, and insisted that use of any chemicals "in

or around" barns be approved in writing by Perdue. According to the Poultry Producer Agreement, "PRODUCER shall not administer or allow to be administered any substance to the flock, including, without limitation, use of any medication, vitamins, minerals, vaccines, disinfectant, insecticide, pesticide, rodenticide, fungicide, herbicide or other chemicals in or around the poultry houses unless authorized and instructed to do so in writing by PERDUE."

60.    More than just the chemicals that were to be used, Perdue's written instructions to Tripp included specific brands of windows that it required she use, specific levels of "static pressure" required in her chicken houses, and specific air velocity requirements, and specific timetables for inspecting equipment on her farm. On information and belief, these requirements were not necessary for the growing of chickens; Perdue required growers to implement them for Perdue's sole benefit, *i.e.*, for growers to grow the chickens Perdue owned precisely to Perdue's specifications.

61.    Perdue requires growers to pay for expensive changes to their chicken houses to comply with Perdue-specific specifications on equipment and facilities—specifications that differ materially from those of other integrators. This includes mandating specific models or brands of equipment to be used. These changes usually require growers to take out large loans. These loans further tie the growers to Perdue, because a continuing contract is often a requirement of the loan and because of the close relationship between Perdue and banks that lend to its growers.

62.    Forcing growers to work inside facilities that are effectively designed for Perdue is another way that Perdue controls the methods and manner of growers' work.

63.    Perdue even retains the authority to take over a grower's farm at Perdue's discretion. Growers are required to assume the cost of Perdue taking over their own farm. Even without invoking that authority, Perdue and Perdue's designated supervisors acted as though they

were entitled to exercise broad control over Tripp's farm. For example, Tripp's supervisor would routinely provide a list of specific changes that needed to be made at her farm after a visit. And Tripp's supervisor would visit her workplace (farm) when she was not there and leave training materials or instructions for her review.

### c. Time

64.     Perdue controls the schedule of its growers' work at every phase of the chicken growing process.

65.     First, Perdue controls the timing for delivery of chicks. Perdue insists growers have to be available to accept birds "when consigned" and have to "be present or represented when birds are delivered and during the catching and movement of each flock." While not detailed in the contract, supervisors make clear to growers that having feed, water, heat, and ventilation to Perdue's specific specifications at the time of placement of chicks is mandatory. In its guidelines, provided after contract signing, Perdue details an extensive list of requirements to be completed on a specific schedule before chick placement (the timing of which is determined by Perdue). For example, temperature monitoring requirements begin "48 hours prior to" Perdue's arrival and air measurements must be done at a specific time.

66.     Second, Perdue controls the timing of work after it delivers chicks through its detailed guidelines that are provided only after the contract signing. For example, Perdue dictates ammonia, temperature, and humidity levels must be checked "daily." Birds must be culled by "approved methods" daily. Charts on bird mortality must be updated "daily." Alarms must be checked every day. Fan guidelines change by the week. Inspection of the exterior of houses is on a set schedule. Bait pads must be "check[ed] weekly." During the first week after placement, it mandated that growers walk up and down and inspect each barn a minimum of "4-5 times per

day." Chicken houses are hundreds of feet long with tens of thousands of chickens, meaning these requirements are a mandate for a significant number of hours worked during this specific phase.

67. Perdue controls the timing of feed deliveries, which can often happen in the middle of the night. Perdue often made feed deliveries to Tripp in the middle of the night. On at least one occasion, Tripp had to pay to fix a feed delivery bin that was damaged by a Perdue delivery after Perdue refused to fix the damage.

68. Additionally, all growers are expected to be present whenever their Perdue supervisor desires them to be present. Perdue also insists that it has the right to enter the grower's property at any time. In Tripp's case, as with many other Perdue growers, this often happened without prior notice. Growers are expected to be on-call for Perdue 24 hours a day.

69. Perdue's supervisors often require growers, including Tripp, to complete tasks on a specific schedule—either in a certain number of days or by the next time the supervisor visits.

70. Perdue requires growers to report "within 24 hours" to their supervisor "if *any* birds, for *any* reason, do not develop normally. . . ." (emphasis added). Because of the broad nature of this requirement and the timeline for reporting to supervisors, this requirement results in forcing growers to inspect every one of the thousands of birds growers maintain custody of at a given time at least every 24 hours.

### III. Exclusive Work Arrangement

71. Under the Poultry Producer Agreement signed by Tripp and all other growers, Perdue requires that growers enter into an exclusive work agreement.

72. The Poultry Producer Agreement specifies that growers agree "[t]o allow or maintain no other poultry, fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises" and states that growers "[could] be immediately terminated" for "allowing or

maintaining poultry, fowl, wild birds, and/or exotic birds on the farm other than PERDUE's poultry." The Agreement even bans growers or those working for growers from maintaining, owning, or caring for any birds or poultry "on any other premises" unless approved by Perdue.

73. After the contract is signed, Perdue takes this exclusivity to extreme and unanticipated lengths. In guidelines provided only after the contract is signed, Perdue bans growers from even *visiting* farms associated with other integrators: "Growers should not visit other poultry producers farms or have contact with any other fowl." Perdue then extends this broad prohibition to "family members" of the grower—even though those family members may not have been party to the original contract. At times, Perdue prohibited Tripp from visiting anywhere chickens may be present, including the State Fair or any other farm.

74. Tripp, like other Perdue growers, was required by Perdue to place a sign with a Perdue logo at the entrance to her land. Like other growers, she was also required by Perdue to place signs and documents inside her barns, including documents with Perdue's logo.

## IV. Supplies and Equipment

75. Under the Poultry Producer Agreement, Perdue provides supplies to Perdue growers. The Agreement requires that growers "use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the health and welfare of the birds consigned." Using supplies "other than those provided by PERDUE" is grounds for terminating the contract.

76. Instead of allowing growers to shop for the supplies that they believe would be best for their operations, virtually all supplies are provided by Perdue—but their cost is later automatically deducted from growers' compensation. Perdue required growers to pay for these supplies even though their use was for Perdue's primary benefit.

77.     Perdue mandates that growers undergo training provided by Perdue through its supervisors, guidelines, and other materials. Tripp was required to undergo training on various topics in person, by watching videos, and through written materials.

78.     While Perdue requires growers to build their own grow out houses (to Perdue's exact specifications) and pay for upgrades to those facilities (that Perdue demands be implemented), growers take on extensive debt on their own behalf in order to do so.  And that is precisely why Perdue falsely holds growers out to be independent contractors—so that Perdue does not have to bear this financial liability.

79.     Tripp's experience was identical to other growers in this respect as well:  She was required by Perdue to purchase expensive equipment that met the company's specifications with the understanding that if she failed to make the purchase, she would not be able to grow for Perdue. For example, Tripp was unexpectedly required to purchase cool pads and fans to meet Perdue specifications and took out thousands of dollars in loans to pay for these specific changes.  Other Perdue growers have publicly discussed the same experience of unexpected equipment purchases required by Perdue, for its sole benefit, that left growers in significant debt.

## V.     At Will Employment

80.     Under the Poultry Producer Agreement and in practice, growers are functionally employed at will.

81.     The Agreement claims that either party can terminate the contract on 90 days written notice.  It also allows only Perdue to terminate if "PRODUCER's farm has been without chickens for more than one hundred eighty (180) days."  And Perdue retains the right in its sole discretion to decide whether or not to provide a grower with chickens.  In other words, this provision allows Perdue to simply stop providing chickens and then fire growers for not having been provided chickens.

82. The Agreement allows Perdue to terminate a grower who "fails to comply with the PERDUE Poultry Welfare and Bio-Security Programs." On information and belief, Perdue uses its animal welfare and bio-security programs as pretext to terminate growers for almost any reason.

83. As described previously, the Agreement allows Perdue to terminate growers for lack of "proper house management or care." On information and belief, determination of "proper house management or care" is entirely at Perdue's discretion and is used to terminate growers for almost any reason.

84. Furthermore, as explained above, Perdue requires growers to report "within 24 hours" to their supervisor "if *any* birds, for *any* reason, do not develop normally…" (emphasis added.) Each flock includes thousands of birds and "normally" is not defined, making this requirement extremely broad and often impossible to genuinely comply with. On information and belief, this unreasonable requirement can be used as a pretext to terminate growers for any reason.

85. As experienced by Tripp, Perdue's supervisors make clear that failure to follow their instructions would also result in termination.

86. Perdue representatives also made clear to Tripp that Perdue could simply stop delivering flocks of chicks at any time. This method at-will termination by simply stopping delivery of flocks is common.

## VI. Payment

87. Despite being controlled as employees, growers do not receive an hourly wage. Instead, they are paid based on what is known as the "tournament system."

88. All growers are guaranteed a level of base pay by contract. This base pay is not tied in any way to the number of hours growers must work to keep their facilities up to Perdue's specifications, and indeed fails to provide a basic wage for the time Perdue's requirements obligate growers to work. And this "guaranteed" pay is not actually guaranteed: Perdue often docks this

base pay based on factors outside growers' control, like the type and amount of chemicals, supplies, or materials Perdue mandates that the grower use and pay for.

89.     Growers are also eligible for a so-called performance bonus under the tournament system.  The performance bonus is based on the average size of the chickens when Perdue picks them up.

90.     These supposed performance-based bonuses, however, have nothing to do with growers' skills and expertise.  Perdue controls all of the inputs, including the quality of the chicks themselves, the amount and nutritional quality of feed, and medications, as well as dictating all of the conditions the chickens must be kept in, including temperature and light.  As a Perdue grower in South Carolina told an investigative reporter in 2020:  "You're penalized if you don't perform and it's not your fault.  You listen to your flock supervisor throughout and then do poorly. Why am I at fault if I do everything they want me to do?"

91.     The "bonuses" are also a misnomer—the reason it is called the tournament system is that growers are pitted against each other, and the "bonuses" paid to certain growers come at the expense of other nearby growers, whose compensation is reduced by the extra amount the "winning" grower is paid.

92.     In addition to the hours of work required to complete Perdue's requirements and assignments, Tripp was required by Perdue to be on call 24 hours a day while its chickens were being raised.  This is typical of all Perdue growers' experience.

93.     Perdue also routinely and unilaterally docks growers' pay for expenses it deems necessary for the work to be conducted in the manner it requires.  For example, an August 2021 settlement report for Tripp indicates that Perdue deducted hundreds of dollars for chemicals and electrical repairs.  Tripp's payments from Perdue were regularly reduced by hundreds or thousands

of dollars for supplies that Perdue required her to purchase, often without the ability to shop for lower prices.  These deductions, which are at Perdue's sole discretion, further contribute to compensation that is uncorrelated with skill or hours worked.

## VII.    Perdue's Misrepresentations to Tripp and Other Growers

94.    In the Poultry Producer Agreement, Perdue falsely represented to Tripp—and falsely represents to all members of the Proposed Collective—that growers would perform work "using the skill, knowledge, and discretion" that each grower "possesses." Agreement § III.A.  In the leadup to signing the Poultry Producer Agreement, Perdue makes similar misrepresentations orally to growers about how they will be able to use their skill to grow chickens and earn a good living.

95.    The Poultry Producer Agreement itself also contains other misrepresentations that growers cannot learn are false until they have signed.  The Agreement states that growers are "exclusively responsible for the performance of [their] obligations under this Agreement." Agreement § IV.B.  This is false, because Perdue actually controls all of the inputs farmers are given to feed and care for chicks, and Perdue's representatives and Perdue's rules—which it withholds until after a grower has signed the Poultry Producer Agreement—dictate to growers the manner in which chickens are to be fed, lit, and housed (among other things), including by requiring growers to make costly upgrades to Perdue's precise specifications.

96.    The Poultry Producer Agreement further promises that both growers and Perdue will keep confidential "any and all oral or written information relating to PERDUE's or [grower's] processes, methodologies, financial and cost information, and other related information and data." Agreement § VII.I.  But this assertion is false, as Perdue knows at the time it makes the representation in the contracts its growers sign. To the contrary, Perdue regularly discloses information about individual growers to other growers in the same tournament system.  Perdue

agents regularly shared confidential information about Tripp with other growers, and shared confidential information about other growers with Tripp. On information and belief, Perdue routinely shares confidential information from one grower with other growers without their knowledge as part of the tournament system.

## VIII. Perdue Intentionally Misclassifies Growers

97.     As outlined above, Perdue's misclassification of growers is an intentional effort to shift risk and financial burden onto growers while maintaining control over every aspect of their work, which they perform for Perdue's exclusive benefit.

98.     Perdue's drafting of the contract that it required Tripp (and all other growers in the Proposed Collective) to sign reflects its knowing violations of the Fair Labor Standards Act.  In the contract, Perdue goes to great lengths to declare "PRODUCER'S INDEPENDENT CONTRACTOR STATUS" despite knowing that Perdue will require compliance with mandatory guidelines and instructions from supervisors that reflect an employment relationship, require functional at-will employment, require work by growers that is integral to Perdue's business, and require training for growers. Perdue drafted the current contract no later than February 2015 and it has remained materially identical since.

99.     In 2015, another North Carolina Perdue grower filed a whistleblower case with the Department of Labor, alleging that Perdue violated the employee-protection provisions of the Food Safety Modernization Act ("FSMA") by retaliating against him for publicly opposing Perdue's labeling and animal husbandry practices.  *Watts v. Perdue Farms, Inc.*, No. 2016-FDA-00003. Perdue sought to have the case dismissed the because only "employees" are eligible for whistleblower protection.  In October 2022, after more than six years of proceedings, a Department of Labor Administrative Law Judge denied Perdue's Motion to Dismiss and ruled that the grower "adequately alleges [Perdue] exercised sufficient control over the details of [the growers] work

and farm operation such that [the grower] could be considered [Perdue]'s 'employee.'" The contract signed by the grower in that case was materially identical to Tripp's and all other Perdue growers, and the methods of supervision and control experienced by that grower and Tripp were substantively identical.

## IX.     Additional Facts Regarding the Named Plaintiff

100.     Tripp worked as a grower for Perdue through October 2021. Through at least October 2021, Tripp continued to make significant payments to meet Perdue's specific requirements. Tripp worked to maintain the farm and facilities in the condition required by Perdue, and otherwise provide the kinds of equipment necessary for Perdue's processes that, had she been properly classified, would have been the responsibility of Perdue.

101.     Perdue also worked to hide the full scope of its control over Tripp's work and the full scope of financial obligations it would force her to incur. Perdue added additional financial requirements and levels of control and supervision on Tripp in her final years of working for Perdue. Perdue also changed its mandatory "guidelines" during the last several years of her time working for Perdue.

102.     On July 25, 2023, Tripp opted into an FLSA collective action against Perdue in the Middle District of Georgia, *Parker v. Perdue Foods, LLC*, No. 22-cv-00268, and became a party plaintiff on that date. The allegations in that lawsuit are substantively the same as the allegations here regarding Perdue's misclassification of growers and its systemic, willful violation of the FLSA. On March 14, 2024, the district court dismissed Tripp from that lawsuit, without prejudice, for reasons unrelated to the merits of her claims or her ability to represent an FLSA collective. That lawsuit remains ongoing, but is no longer proceeding as a collective action.

# COLLECTIVE ACTION ALLEGATIONS

103.    Tripp brings this action individually and on behalf of herself and all others similarly situated[3] under the Fair Labor Standards Act, 29 U.S. Code § 216(b), as the representative of a collective (the "Proposed Collective") defined as follows:

> All individuals nationwide who currently grow or formerly grew chickens for Perdue under a Perdue Poultry Producer Agreement at any time between April 4, 2021 and the present.

104.    The Proposed Collective does not include growers subject to the Draper Valley Farms Broiler Growing Agreement or the Petaluma Broiler Growing Agreement.

105.    Plaintiff and all members of the Proposed Collective are similarly situated.  They were subject to substantially similar job requirements, pay provisions, and a common policy or practice that required them to perform work for the benefit and at the direction of Perdue without receiving proper wages and while being forced to bear improper expenses.

106.    Plaintiff estimates that there are hundreds of similarly situated current and former growers whose rights to federal minimum wages and overtime payments are, were, and will be violated by Perdue.

107.    Perdue knew that Plaintiff and the Proposed Collective performed work that required them to be compensated at the federal minimum wage.  Perdue willfully and intentionally failed to properly compensate these individuals as required by the FLSA, and forced them to bear costs that it knew it could not properly force its employees to bear.

108.    Perdue is liable under the FLSA for failing to properly compensate Plaintiff and the Proposed Collective, and as such, notice should be sent to the Proposed Collective.  There are

---

[3] While the Poultry Producer Agreement purported to bar class action or other representative claims, Perdue may not enforce that clause due to a recent class action settlement.

many similarly situated current and former growers for Perdue who have been denied proper minimum wage and overtime payments in violation of the FLSA who would benefit from the issuance of Court-supervised notice of this lawsuit and the opportunity to join.

109.    Those similarly situated employees are known to Perdue and readily identifiable through its records.

110.    Plaintiff and members of the Proposed Collective should therefore be permitted to pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

111.    A collective action will provide the most efficient mechanism for adjudicating the claims of Plaintiff and the members of the Proposed Collective.

112.    Plaintiff requests that she be permitted to serve as a representative for those who consent to participate in this action and that the action be granted collective action status pursuant to 29 U.S.C. § 216(b).

## COUNTS

### COUNT ONE: FEDERAL MINIMUM WAGE
### (Fair Labor Standards Act (FLSA) 29 U.S.C. § 216)
### (On Behalf of Plaintiff Individually and the Proposed Collective)

113.    Plaintiff incorporates all prior paragraphs as if they were fully set forth herein.

114.    Plaintiff and the other growers in the Proposed Collective were employees of Perdue.

115.    The FLSA requires Perdue to pay its employees at least the federal minimum wage of $7.25 per hour.  29 U.S.C. § 206.  The FLSA also requires Perdue to pay its employees this wage "free and clear" from other obligations.  29 C.F.R. § 531.35.  Federal law requires the minimum wage to be calculated deducting the costs imposed on employees for building or maintaining "facilities" that are "primarily for the benefit or convenience of the employer."  29

C.F.R. § 531.3(d)(1). Such "facilities" include (but are not limited to) "[t]ools of the trade and other materials and services incidental to carrying on the employer's business," and "the cost of any construction by and for the employer." *Id.* § 531.3(d)(2)(i)-(ii).

116. Perdue did not pay Plaintiff what it was required to under the FLSA. Similarly, it has not paid other members of the Proposed Collective what it was required to under the FLSA.

117. Plaintiff has earned less than the minimum wage due to Perdue's low pay combined with the deductions Perdue automatically made from Plaintiff's pay for facilities expenses Perdue improperly required her to cover, like upgrades to chicken houses and supplies and service contractors chosen by Perdue to perform work primarily for Perdue's benefit. Plaintiff's experience is typical to other members of the Proposed Collective.

118. Plaintiff often worked over 60 hours per week. She was expected to be on call 24 hours a day. After accounting for facilities expenses required by Perdue to be spent primarily for Perdue's benefit, Plaintiff was often making a fraction of the minimum wage per hour worked. Plaintiff's experience was typical of all the growers in the Proposed Collective.

119. Perdue's violations were willful. As described above, Perdue knew that Plaintiff and its other growers were not independent contractors and were instead employees, and that Perdue should have been paying growers the federal minimum wage required by the FLSA.

120. Plaintiff, individually and on behalf of herself and other members of the Proposed Collective, seeks damages under the FLSA in an amount equivalent to the difference between what Perdue paid and what it should have paid to its growers had they been properly classified, as well as any other damages that are appropriate, including liquidated damages.

## COUNT TWO: FEDERAL OVERTIME
### (Fair Labor Standards Act (FLSA) 29 U.S.C. § 216)
### (On Behalf of Plaintiff Individually and the Proposed Collective)

121.    Plaintiff incorporates all prior paragraphs as if they were fully set forth herein.

122.    Plaintiff and the other growers in the Proposed Collective were employees of Perdue.

123.    The FLSA requires Perdue to pay its employees at least one-and-one half times the federal minimum wage for all hours worked in a given week over forty hours.  29 U.S.C. § 207.  The FLSA also requires Perdue to pay its employees this wage "free and clear" from other obligations.  29 C.F.R. § 531.35.  Federal law requires the minimum wage to be calculated deducting the costs imposed on employees for building or maintaining "facilities" that are "primarily for the benefit or convenience of the employer."  29 C.F.R. § 531.3(d)(1).  Such "facilities" include (but are not limited to) "[t]ools of the trade and other materials and services incidental to carrying on the employer's business," and "the cost of any construction by and for the employer."  *Id.* § 531.3(d)(2)(i)-(ii).

124.    Perdue did not pay Plaintiff what it was required to under the FLSA's overtime provision.  Similarly, it has not paid other members of the Proposed Collective what it was required to under the FLSA's overtime provision.

125.    Plaintiff and the other members of the Proposed Collective were regularly required by Perdue to work in excess of forty hours a week.  For example, Tripp was often required by Perdue to work over 60 hours per week.  She was expected to be on call 24 hours a day.  This experience was typical of all the growers in the Proposed Collective.

126.    Plaintiff has earned less than the minimum federal overtime wage due to Perdue's low pay combined with the deductions Perdue automatically made from Plaintiff's pay for

facilities expenses Perdue improperly required her to cover, like upgrades to chicken houses and supplies and service contractors chosen by Perdue to perform work primarily for Perdue's benefit. Plaintiff's experience is typical to other members of the Proposed Collective.

127.    Plaintiff and the other members of the Proposed Collective engaged in numerous activities that do not constitute agriculture work, such as by acting as a general contractor overseeing capital improvements Perdue required to be made to facilities, implementing biosecurity guidelines, and engaging in maintenance, sign-posting, and other work when no chickens were on the land.

128.    Perdue's violations were willful.  As described above, Perdue knew that Tripp and its other growers are not independent contractors and were instead employees, and that Perdue should have been paying growers the federal overtime wages required by the FLSA.

129.    Plaintiff, individually and on behalf of herself and other members of the Proposed Collective, seeks damages under the FLSA in an amount equivalent to the overtime Perdue should have paid to its growers had they been properly classified, as well as any other damages that are appropriate, including liquidated damages.

130.    Tripp asks that the Court conditionally certify an opt-in collective of growers to pursue this claim.  *See* 29 U.S.C. § 216(b).

### COUNT THREE: DECLARATORY JUDGMENT
**(Federal Declaratory Judgment Act 28 U.S.C. § 2201(a), *et seq.*)**
**(On Behalf of Plaintiff Individually and the Proposed Collective)**

131.    Plaintiff incorporates all prior paragraphs as if they were fully set forth herein.

132.    Tripp and members of the Proposed Collective are or were employees of Perdue.

133.     Tripp and members of the Proposed Collective have been misclassified by Perdue throughout the relevant period.  Perdue continues to misclassify its growers as independent contractors rather than employees today.

134.     This creates a controversy, both as to Tripp and as to each member of the Proposed Collective, regarding the nature of their rights and Perdue's ensuing obligations.

135.     Tripp and members of the Proposed Collective are entitled to a declaration that they are or were employees of Perdue and must be treated as such. Perdue would then be free to either modify its business practices to provide independence to future growers or to modify their policies to provide employee pay and benefits to future growers.

## JURY DEMAND

136.     Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of herself and all others similarly situated, demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of herself and all others similarly situated, respectfully requests that this Court:

A.     Issue an order certifying this action as a collective action under the FLSA and designating Plaintiff as representative of all those similarly situated, 29 U.S.C. § 216(b).

B.     Authorize that notice of this collective action be issued by the Court or Plaintiff to all members of the Proposed Collective.  Such notice shall inform these persons of the filing of this civil action, the nature of the action, and their right to join this lawsuit if they believe they were denied proper wages pursuant to 29 U.S.C. § 216(b);

C.     Enter judgment against Perdue in favor of Plaintiff and the Proposed Collective;

D.     Award Plaintiff and the Proposed Collective compensatory damages in an amount to be determined at trial;

E.   Award Plaintiff and the Proposed Collective liquidated damages in an amount to be determined at trial;

F.   Award Plaintiff and the Proposed Collective their costs and expenses of suit, and reasonable attorneys' fees as provided by law

G.   Award Plaintiff and the Proposed Collective pre- and post-judgment interest;

H.   Enter a declaratory judgment affirming that Plaintiff and the members of the Proposed Collective are/were employees and not independent contractors;

J.   Issue other and further relief as the Court may deem just and proper.


Jamie Crooks*
D.C. Bar No. 156005
Michael Lieberman*
D.C. Bar No. 1033827
**FAIRMARK PARTNERS, LLP**
1001 G Street NW
Suite 400 East
Washington, DC 20001
(617) 721-3587
jamie@fairmarklaw.com
michael@fairmarklaw.com
*Pro Hac Vice* applications forthcoming

/s/ Charles Gerstein
Charles Gerstein, #21720
D.C. Bar No. 1033346
**GERSTEIN HARROW LLP**
1001 G Street NW
Suite 400 East
Washington, DC 20001
(202) 670-4809
charlie@gerstein-harrow.com


*Counsel for Plaintiff and the Proposed Collective*